United States v. Olson and it's 21-28 and it's Ms. Ettinger. Yes, your honor. Thank you. Good morning and may it please the court. Jessica Ettinger for defendant appellant Kyle Olson. This appeal involves the intersection of the Terry Doctrine and Wisconsin's concealed carry law. And the undisputed facts are these. Three officers saw Kyle Olson by his car at night in downtown Madison, Wisconsin. The area was well lit and there was civil unrest nearby, but Olson was by himself apart from it unaffiliated. He looked around, he put a gun in his waistband. Wisconsin is a concealed carry state. The officers did not know Mr. Olson and he could have been anyone. Yet, based on... But wasn't there something that the officer might think was furtive about his behavior? Certainly, your honor. Mr. Olson looked around at his surroundings, but it wasn't furtive in a sense that it would give rise to reasonable suspicion enough to stop Mr. Olson. Even though he's holding something that might be alcohol and puts a gun under his shirt and we have a very good idea of what was going on all around. It was a very terrible evening and day. The two points that you've just pointed to, Judge Rogner, about a can that they had questions about or the fact that Mr. Olson might have had a gun, were good reasons for the officers to engage in a consensual encounter and to walk up to Mr. Olson and to investigate further. The problem here is that there was no investigation whatsoever. In fact, based on seeing what you've just described and I've just described, all three officers instead rush at Mr. Olson. They all draw their weapons, surround him at gunpoint, and then they forcibly subdue, frisk, disarm, and handcuff him. They go into his pockets and they move him to a nearby porch. And during this, to be clear, they do not ask a single question. Do you really think that asking him a question or two first would have lessened any of the chaos? I mean, it was so chaotic there. Well, two responses to Your Honor's question, because there was chaos around Mr. Olson, but not immediately near him. So the officers are approaching Mr. Olson from the second story of a church across the street from where Mr. Olson has parked his car. And so when we say that there was chaos going on that evening, it's not immediately close to Mr. Olson. There's no emergency vis-a-vis Mr. Olson, who is just standing beside his car at the time. But don't you think that would be that the really, you said civil unrest, but it was really a violent evening with a lot of volatile violence going on with arson and vandalism, all in the immediate vicinity of where he was. That seems highly relevant to the totality of the circumstances analysis. It's certainly relevant, Judge St. Eve, and I'm picking the phrase civil unrest because that's what the officers used during their testimony and the was happening that evening. I'm just trying to clarify what was happening with respect to Mr. Olson specifically, because I do think it's important to the totality of the circumstances. And so had officers gone down the two flights of stairs and approached Mr. Olson, they could have engaged in questions. Those are two second questions. Is that a gun? Do you have a permit? They made no effort whatsoever to do that. But we submit, Your Honors, that there wasn't even reasonable suspicion for a stop. In fact, this court has been very clear in saying that the mere possibility of unlawful use of a gun is not sufficient to give rise even to reasonable suspicion that's required for a Terry stop. And the court has repeated that subsequent. Why? Why? I don't, you know, why shouldn't the good faith extension, uh, even if we agreed with you, either that there were no grounds for a Terry stop or, or, or it was worth, you know, the stop wasn't justified. I mean, um, why wouldn't, uh, I mean, again, we have to understand that it points against true civil unrest. It presented terrible, concrete dangers to the police, to the larger, uh, Madison community. And it was sort of a classic case of the police needing to make complex judgments right on the spot. I mean, So, so judge Rovner, I would push back on your question a little bit, because I think buried in the, at the base of the question is a presumption that guns inevitably lead to violence. And the problem is in Wisconsin, a concealed carry state, it is lawful to conceal, carry a gun. And so think about where he is and what is going on around him and the fact that he's hiding it and looking around again, it is, it's a totality of the circumstances. These are really pretty difficult circumstances. Wouldn't you agree? Difficult circumstances, but it was a deliberate choice for the officers to engage in the way that they did. And the problem, as we talk about totality of the circumstances, of course, that's, that's the right phrase and standard for the court to be looking at. And this court has made clear also that just being in a high crime area as part of the totality of the circumstances isn't enough. It doesn't create the plus factor that would lead to violence. Can I, did the defendant testify to explain what he was doing there at 11 o'clock at night with a concealed weapon in the middle of a riot? He did not. He did not testify at the evidentiary hearing, Your Honor, no. And suppose we were to affirm in an opinion that says in essence that that night in that place, these officers had reasonable suspicions for approaching him with a, with a coercive Terry stop. What harm do you think we would do to Fourth Amendment interests if we wrote such an opinion specific, so specific to these circumstances? I think the harm, Your Honor, is that these types of circumstances come up frequently. And so while there may be high crime area that's specific to downtown Madison, I'm not talking about high crime areas. We're talking here about active rioting and looting within a block in both directions of this location. So two, two responses then, then Judge Hamilton, the concern would be that the stop combined with the frisk was lawful under the circumstances when those are supposed to be separate inquiries. What was the articulable suspicion that the officers had, even if the stop itself was, was acceptable under the Fourth Amendment, how do you get to the frisk? Because otherwise it's a rote and reflexive frisk. And this court has said that's not acceptable under the Fourth Amendment. They didn't, they didn't ask a single question, even when they had him at gunpoint and he's perfectly compliant. The other, the other concern though, is that officers, of course, have to apply this, this precedent that we're talking about, this court writing outside of this context. And that's where the deterrence to come back to Judge Robner's earlier question is so important because this opinion would have to be applied outside of, outside of this context. And there's nothing to distinguish Mr. Olson from any other person. So it's exactly what the magistrate judge anticipated. It's that this activity, this response by the police officers could be perfectly acceptable outside of this context, such as Sunday afternoon on the golf course. So perfectly. We'll talk about that example. But certainly, so the, so the concern is that plenty of law abiding citizens are going to be subjected to these very forceful detentions by officers without the sort of reasonable articulable suspicion that the Terry Doctrine demands. And that's, that's incredibly concerning. Judge Robner, did I address your question about deterrence adequately or do you still have a question about that? No, thank you. Thank you. And Judge Hamilton, did I answer your question? You answered it. Okay. Thank you. I see us have just a couple of seconds remaining. So if I may, I'd reserve for rebuttal. Well, you're going to get your full three minutes. Thank you, Judge Robner. Okay. All right. Now, is it Mr. Stephan? Is that how you pronounce your name? Stephan, Your Honor. Stephan. Mr. Stephan. Hello. Good morning. And may it please the court. My name is Corey Stephan and I represent the government in this matter. The district court correctly concluded that under the totality of the circumstances, the officers were permitted to use reasonable force to affect a investigatory detention on Mr. Olson in this case. And courts have recognized that it's hard to offer a crisp definition of what exactly is an arrest. There are no cases that have an exact factual overlay with the Olson case. And I think we're glad about that. But we do know that reasonable force is allowed in certain circumstances to affect investigatory detentions. Further, officers don't have to rule out potential innocent behavior. As we see in the Richmond case, the officers testified that the Mr. Richmond was not acting in the way that somebody with the concealed carry license might act on their property. And this was part and parcel of other issues and facts. But the court found that the potential innocent explanation of a concealed carry license did not discharge the other relevant facts the officers were considering at that time. So using that as kind of a structure to move forward, I think that the court and the questions that we've heard here today are on point. This was, to say it was an unusual circumstance would be a quite an understatement. This was a very extreme circumstance. It was day two of what has been called a civil unrest, but really it was riot-type behavior that followed peaceful protests. There was assaults on police officers, there were broken windows up and down State Street, arson, looting, assaults on officers. There was a squad car that had been burned the night before and two AR-15s stolen from it. And looking at this, basically one block chunk between State Street and North Henry Street on West Gilman, which is five blocks down from the Capitol, these officers were very close and surrounded on both sides. And the testimony at the evidentiary hearing was that there was a parking lot across the street that was being used as kind of a staging area for rioters, protesters, and I think as the term had been used in I believe the report and recommendation, riot tourists coming to the scene. So the officers testified about the set team that had went out, the troubles that they were facing, and when all of this happened, they had literally seconds to make a determination. And under the totality of the circumstance, it is an extremely unusual circumstance that they were presented with, and they had literally seconds to make a decision as to what they do and what they did. What impact should it have that the officers here didn't ask him anything from the time that they approached him through the time that they arrested him, including what's your name? In terms of the impact, I think that was largely taken away by the fact that their first concern was they had to secure the gun, and they secured the gun, and the defendant immediately said that he was a felon. I don't think that they had a lot of time to talk and make those investigatory, do that questioning at that point. I think had he not said that he was a felon, they probably would have done that, but that's not this case. The case is that within a very short period of time, almost immediately, he blurted out that he was a felon, and then the concealed carry permit became irrelevant. Why he was there became irrelevant. The alcohol, potential alcohol, was irrelevant. It was a violation of federal and state law, and at that point, it transferred into an arrest, and the officers took him aside and moved him to the porch because the testimony was that there was the crowd starting to converge, and they're starting to get angry and yell at the police officers. Mr. Stephan, could I ask you, as we're thinking about this problem, to address the magistrate judge's country club hypothetical? I confess to having some trouble with that, given Wisconsin's concealed carry law. I would have to review the important recommendation. I don't, my recollection is that the magistrate didn't say that that would be an opportunity where the same thing could have been done by the officers, but it certainly was a different situation. You know, somebody calmly walking into a golf course, or a grocery store, or walking down the street. The magistrate judge suggested that this would be sufficiently suspicious if it were in the parking lot of the Maple Bluff Country Club. And I think that it would be suspicious, and I think that that would have been a case where the officers would have had the luxury of a little more time and a more stable situation around them, wherein they could have asked some of those questions. They could have approached, sir, may I talk with you? That would be sufficient for a consensual encounter, but not necessarily a coercive one. Depending upon the circumstances surrounding it, certainly, obviously, an officer can always make a consensual contact. But given Wisconsin law on allowing concealed carry, just seeing someone and realizing they actually have, or may have, a concealed weapon doesn't seem to be enough to support an investigative stop. I can't say that with certainty, but applying some of the cases that we have looked at, the Richmond case, for example, the Schubert case from the Fifth Circuit, you know, and that was a case where the fact that it turned out to be a prominent attorney, I think, was mentioned in the decision. He was walking into a courthouse, and I think that significant stop was given on the fact that it was an immediate need because he was walking into a courthouse. Perhaps that immediate need wouldn't be there if somebody were simply walking across the parking lot of a country club. Was it Richmond based on the fact that the individual who they saw had the gun, or the bulge that appeared to be a gun, that he then changed directions, avoided the police, took some extra actions, unlike the country club example? That's correct, Your Honor, yes. Does that answer your question adequately, Judge Hamilton? It answers it, we'll see. So, based on the totality of circumstances and what the officers saw, the district court did correctly conclude that the use of force was appropriate for the investigatory detention. Mr. Stephan, would you agree that the officers did not have probable cause to arrest until the defendant said he was a felon? I would agree. Thank you. And then, I've got to, I recognize that both the magistrate judge and Judge Connolly were troubled by the officers, the differences between the officers' testimony and their contemporaneous written reports. Why should we credit Officer Marzullo's testimony, given the absence of any effort to correct that after having read and re-read his report many times, and then finally, we get the decisive Fourth Amendment switch in the motion to suppress Erie? That's a great question, and the reason that the court was not clearly erroneous in making that credibility determination is that the facts on the record supported Officer Marzullo's testimony. The report and recommendation and Judge Connolly's decision dealt with the issue of credibility head-on, did not beat around the bush at all. In fact, I think it was Magistrate Judge Crocker who said that skepticism was warranted, so they started from a position of, let's be critical about this, and they were critical about it. The information that supports it is the radio traffic, to be honest. The call comes out about the possible 32 at 2305-42, 12, 14 seconds later, they called that the 32 was secured, and then a minute later, or 30 seconds later, Dan Hamilton called out that there was a 95, which was the arrest. That supports the sequence of events, and what Officer Marzullo testified to is he testified basically clarifying a paragraph that was a jumbled sequence of facts that were not parsed out and put in order, and he did not review that report after he dictated it, so the district court did not clearly err in making that credibility determination, and finally, if the court disagrees, suppression is not warranted in this case. I see my time has expired. You may continue until you're, you know, done to a certain point. Thank you, Your Honor. Just getting back to the credibility determination, you know, these officers all testified that they knew the difference between a contact and a detention. You know, there certainly was, you know, no hiding the error in the report, and really, it was just a matter of parsing out what the details were. Officer Marzullo testified he dictated the report. He didn't review it. He was working 12-plus hour shifts going back on the next day, and he actually clarified that, particularly on cross-examination, he said on cross-examination that he knows that a pat-down doesn't let him go into pants pockets, which would have resulted in finding the marijuana. A pat-down lets him feel for weapons and go in pockets if there were weapons in the pocket, but the search incident to arrest does allow him to go in the pocket, which resulted in the marijuana. That's further evidence and support and based on what was found to be a credible testimony as of the sequence of events in this case. Investigatory detention, pat-down, recovery gun, statement that he's a felon, officers, this is now an arrest. We're now in 95. Search incident to arrest. By the way, we're being surrounded by people who are cursing at us. Let's get them to the porch and stabilize. That's the government's response. Again, the final point is that suppression would not deter any future conduct because this is such an unusual circumstance. If there are no other questions, thank you very much. Thank you very much. Ms. Ettinger, three minutes. Thank you, Judge Ropener. I had the benefit of thinking more about Judge Hamilton's question as to what harm could be caused by an opinion that limits the reasonable suspicion here and in finding that the stop and the first were fine. I think the concern would be that it would create essentially a mob exception to the rule, that it's not just a high crime area, but that there's some other exception, some mob exception that applies and allows officers to behave that way. It's particularly concerning specifically in this case because of Wisconsin's concealed carry law. When we talk about deterrence, we talk about not the Schubert case, which is from an out-of-circuit, it's an out-of-circuit decision, but of Watson, where the court is very clear in saying mere possibility is not enough to give rise to reasonable suspicion. Officers should know that precedent and should be respecting it in the way that they respond in their everyday actions. When my colleague says their first concern was they had to secure the gun, that's a problem in this circuit, in Wisconsin specifically. Why is that a problem? That is, would seem to me quite reasonably the police officer's first priority in this encounter. If they had reasonable suspicion of a crime, Your Honor, then securing the gun would make sense, provided they thought he was both armed and dangerous, not simply possessing a gun or that he didn't have a permit. But when there are no questions asked, then that's the problem. I'd like to speak briefly as well about my colleague's comments concerning the timing of Mr. Olson's voluntary disclosure about his prior felonies. We, of course, dispute the timing of determination. This isn't the classic credibility determination that this court might ordinarily defer to the district court on. These are three officers who change their story on the key fact fundamental to this case eight months after the fact and after the defense has filed a motion to suppress. Ms. Ettinger, your argument is based on the conflicting appearance of events between the live testimony and the reports. Your client didn't put in an affidavit or any other evidence. Is that correct? No affidavit from my client, Your Honor. That's correct. I would add, though, that it's not simply the contradiction between the written reports, which of course are contemporaneous, and the live testimony, but also the audio recording. I think my colleague is writing. I'm sorry, the what reporting? The audio recording. It's exhibit F at the evidentiary hearing. And it's very important because I think my colleague is painting with too broad a brush when he says that that audio recording corroborates events. In fact, it contradicts it. If I may finish that thought, Your Honor. Thank you. It's the problem is that roughly 30 second gap that my colleague mentioned. It cannot be that there was a disclosure at the time that Mr. Olson is disarmed because we know that the disclosure most likely happened at the time the 95 is called. And there's a solid gap between those two items. I'm happy to address any questions that the court has on that point, but otherwise I would rest on our briefs descriptions of that contradiction. All right. For the questions we asked for a reversal. Thank you. Anyone have any further questions? No, thank you. Thank you. Well, thank you both so very much. We're going to take the case under advisement. We just want you all to take care of yourselves in these difficult times. And this court is going to be in recess.